## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOHN CHRISTOPHER BLESSING,

     Plaintiff,

v.                                     Case No. 3:19-cv-731-TJC-MCR

MIKE WILLIAMS, in his official
capacity as Sheriff of the
Consolidated City of Jacksonville,
Florida, OFFICER TIMOTHY
JAMES, individually, OFFICER
KATHLEEN CAMACHO,
individually, and ASM GLOBAL, a
foreign corporation,

     Defendants.

_____

## **O R D E R**

    This case is before the Court on Defendant ASM Global's Amended Motion for Summary Judgment (Doc. 98); Defendant Sheriff Mike Williams' Motion for Summary Judgment and Motion to Exclude Testimony of Plaintiff's Expert (Docs. 100, 101); and Defendants Timothy James and Kathleen Camacho's Motion for Summary Judgment. (Doc. 102). Plaintiff John Christopher Blessing has responded to all four motions. (Docs. 103, 104, 105, 106). Williams, Camacho, and James have filed replies. (Docs. 109, 110, 111).

## I. BACKGROUND

This case stems from Blessing's 2016 arrest at a Pearl Jam concert in downtown Jacksonville. Blessing claims that he was violently and illegally arrested though he did nothing wrong. The police argue that he was properly arrested after drunkenly biting the woman sitting in front of him.

Blessing individually sues James and Camacho, the Jacksonville Sheriff's Office ("JSO") officers who arrested him, for violations of the Fourth and Fourteenth Amendments: James alone for excessive force and both officers for false arrest. (Doc. 42 at ¶¶ 52–60). He sues the Sheriff for enabling these alleged Constitutional violations by failing to discipline JSO officers and habitually allowing abuses. Id. at ¶¶ 61–63. He also sues the Sheriff under Florida law for battery and false imprisonment. Id. at ¶¶ 64–72. And finally, he sues the company that managed the concert venue, ASM Global, doing business as SMG, for negligently hiring abusive and dishonest off-duty police officers to staff the concert. Id. at ¶¶ 8, 73–79.

All defendants move for summary judgment. James and Camacho argue that their actions fall within qualified immunity. (Doc. 102 at 11–24). The Sheriff argues that James and Camacho acted properly, that JSO properly trains and disciplines its officers, and that JSO neither has nor allows widespread or habitual abuses. (Doc. 101 at 8–17). And SMG argues that it did

2

not negligently hire James and Camacho because it neither hires nor employs the off-duty officers who staff its events. (Doc. 98 at 6–10).

#### Facts

The parties agree that on April 13, 2016, Blessing and three friends—Haley Allen, Jim Muse, and David Koncul—attended a Pearl Jam concert at the Veterans Memorial Arena in Jacksonville. (Doc. 42 at ¶¶ 9, 19–20); (Doc. 101-2 at 46:9–23). With Allen as the designated driver, they rode together from the Brunswick, Georgia area. (Doc. 101-2 at 47:19 –48:19). About an hour before the concert, they stopped at Bistro Aix in downtown Jacksonville for drinks and appetizers. Id. at 48:1–3. There, Blessing had two vodka tonics and ate some light fare, including bread and escargot. Id. at 50:15–21.

They went from the restaurant to the concert venue, taking their seats before Pearl Jam began playing. Id. at 51:5–15. Their seats were on the second level of the stadium and directly faced the stage. (Doc. 101-5 at 11:2–21, 92:12–15). The Blessing party's four seats were located about halfway up the section and included the aisle seat and the three adjacent seats. (Doc. 101-2 at 53:5–22). Blessing took the aisle seat, Allen was next to him, then Koncul, and Muse was the furthest inside. (Doc. 101-2 at 53:8–15). Sitting just ahead was the Bray party, consisting of Patricia Bray, her friend Kristi Carlson, her brother Robert Spinks, and his wife Rebecca Spinks. Id. at 53:24–25; (Doc. 101-5 at 21:21–23:10). Bray and Carlson were in the row directly in front of the

3

Blessing party, and the Spinkses were one row ahead of Bray—all within the same cluster of seats. (Doc. 101-5 at 21:4–14, 22:21–23).[1]

Here, the accounts begin to diverge. Shortly before the concert began, Blessing and his party began "goofing around" with the Bray party. (Doc. 101-2 at 55:4–12); (Doc. 101-5 at 20:5–21). Blessing recalls that his friends and he began leaning in and "photobombing" the Bray party's FaceTime videos. (Doc. 101-2 at 55:7–12). Bray admits that her sister-in-law—who sat in front of her—was FaceTiming, but she does not recall the photobombing. (Doc. 101-5 at 45:11–16, 93:15–16).

**The Bites and Spilled Beer**

Shortly after the music started, Bray states that Blessing bit her on the left shoulder. (Doc. 101-5 at 13:1–5). She explains that it was not a hard bite and that Blessing was "intoxicated," "belligerent," and "trying to be funny." Id. at 17:22–18:1. She claims that she turned around, looked him in the eyes, and told him "do not do that," but Blessing ignored her and did not react. Id. at 18:23–19:7. Bray recalls that in the moments after the bite, Blessing and his party continued to be "belligerent" and "distracting," trying to "dance around [her party]" and "trying to get in between [them]." Id. at 20:5–11. Blessing and

---

[1] Blessing's account differs, placing the Bray party all in the same row. (Doc. 101-2 at 54:2–12). However, his position relative to Bray is the same in both accounts. Id. at 54:2–4; (Doc. 101-5 at 21:21–24).

his friends deny that he bit Bray or that she confronted him at this point. (Doc. 101-2 at 356:20–21); (Doc. 102-6 at 100:23–101:1) (Allen's deposition); (Doc. 102-7 at 73:21–24) (Muse's deposition); (Doc. 102-8 at 64:25–65:7) (Koncul's deposition).

A few minutes after she was allegedly bitten, Bray went to the bathroom and checked her shoulder to see if there were any bite marks. (Doc. 101-5 at 54:22–55:10, 70:11–14). She saw no visible marks. Id. at 70:15–18. Then, sometime after the first bite, Bray alleges that Blessing bit her a second time. Id. at 23:11–17. This time, she states that she turned around, saw his face was still close to her, pushed it away, and said "don't do that again." Id. at 23:19–24:5. The second bite did not leave marks either. Id. at 122:12–17. Blessing denies that this second bite occurred and does not recall Bray ever pushing his face. (Doc. 101-2 at 159:22–160:1, 357:17–21). He does, however, recall a verbal confrontation wherein Bray used an expletive, purportedly in response to his persistent photobombing. Id. at 62:4–15.

After this confrontation, Blessing stopped interacting with Bray. Id. at 67:13–17. About ten or fifteen minutes later, Blessing left his seat to use the bathroom and buy a beer. Id. at 67:18–20; 357:7–16. While Blessing was out of his seat, Allen poured some beer from her cup onto the back of Bray's head. (Doc. 101-5 at 24:9–14). Allen explained to Bray that she had been trying to pour the beer into Muse's cup. Id. at 48:3–5; (Doc. 102-6 at 35:2–11). When Bray

5

turned around after the spill, she noticed that Blessing was no longer behind her but was higher up in the section instead. (Doc. 101-5 at 24:9–25, 104:6–14). Blessing's party remembers Bray screaming at them; Bray disagrees. (Doc. 102-6 at 34:20–25); (Doc. 101-5 at 30:3–10). But Blessing returned shortly thereafter and switched seats with Allen so she was now on the aisle and Blessing was one seat in. (Doc. 101-2 at 57:9–25). Shortly after Blessing returned, Allen and Koncul went up to the concession area. (Doc. 102-6 at 21:1–14); (Doc. 101-8 at 71:11–17).

### SMG Contacts James and Camacho

Around the time Blessing was returning to his seat, Bray flagged down a nearby SMG employee—one of the concert venue's staff. (Doc. 101-5 at 106:1–8). She told the SMG employee that Blessing needed to move, that he had bitten her, that members of his party had poured beer on her, and that his party was being disrespectful. Id. at 13:17–23. The employee then left and spoke with Camacho, who was the off-duty JSO officer assigned to that section. Id. at 13:24–14:1; (Doc. 101-4 at 79:21–80:1, 88:7–9). He told Camacho that a male and female patron were arguing. (Doc. 101-4 at 80:2–8, 107:14–20). James, the off-duty JSO officer assigned to the adjacent section, overheard the SMG employee speaking with Camacho. Id. at 78:1–13; (Doc. 101-3 at 57:20–58:2, 129:1–3). Camacho and James followed the SMG employee to the Bray and Blessing parties. Id. at 130:4–5; (Doc. 101-4 at 81:15–21).

**Camacho and James' Account**

Camacho and James's accounts after they arrived at the seats are generally consistent. Camacho recalls seeing "several individuals just going back and forth and yelling at each other." (Doc. 101-4 at 82:1–2). James saw only two people arguing: Blessing and "the female in front of him." (Doc. 101-3 at 62:24–63:4). Camacho recalls Bray grabbing her attention and saying, "Hey, this guy just threw beer on me and bit me in my arm, my shoulder." (Doc. 101-4 at 82:4–6). Camacho told Bray to come with her and instructed James to "take Mr. Blessing and escort him up the stairs." Id. at 83:10–12. Blessing was "wobbly on his feet," so James "brace[d] him as he walked so he didn't fall backwards." (Doc. 101-3 at 60:12–15). After arriving at the concessions-area landing above that section of seats, Camacho explains that Bray repeated that Blessing had bitten and poured beer on her, and Bray showed Camacho visible bite marks on her shoulder. (Doc. 101-4 at 90:11–17). Camacho also indicates that Bray told her that Blessing had struck her on the back of the head with an open hand. Id. at 92:9–12, 95:19–24. Camacho relayed this to James and told him to handcuff and arrest Blessing. Id. at 96:2–7.

James states he turned Blessing around and cuffed one wrist, but Blessing started trying to pull away. (Doc. 101-3 at 60:20–24). James "yelled 'get back' to anyone who was behind [him]" and took Blessing to the floor using a "straight-arm takedown." Id. at 67:8–13, 69:25–70:2; (Doc. 101-4 at 96:12–20).

Blessing ended up on his stomach, James pressed his knee into Blessing's back, finished cuffing him, and then pulled Blessing back up on his feet. (Doc. 101-3 at 70:5–23); (Doc. 101-4 at 98:5–12). From there, James marched Blessing to the stadium's loading dock to transport Blessing for arrest. (Doc. 101-3 at 70:20–23).

Camacho notes that, besides interviewing Bray, she never spoke with anyone else from the Bray party. (Doc. 101-4 at 92:25–93:10, 103:22–25). While James was being cuffed and moved to the loading dock, Camacho recalls a male and female attempted to interact with her. Id. at 94:17–25. She states that they were "screaming and spewing profanity and cursing" and said that Blessing had not done anything. Id. at 94:17–25, 100:8–13. Camacho states that she "attempted to talk to them," but they were "clearly intoxicated" and "would not calm down," so she told James to continue with the arrest. Id. at 94:9–18, 100:7–18. After remaining "just a few more seconds," Camacho took Bray's information and followed James to the loading dock. Id. at 100:21–101:4. Camacho states that Bray refused to give a written statement, declined medical treatment, and declined to allow an evidence technician to take photos. Id. at 101:4–15.

At the loading dock, James reported to a supervising sergeant. (Doc. 101-3 at 70:24–71:2). Around this time, Camacho began filling out her police report. (Doc. 101-4 at 104:21–105:1). Meanwhile, a man from Blessing's party, who had

followed them to the loading dock, spoke briefly with Blessing and secured some of Blessing's personal property. Id. at 119:23–120:18. Although he was not belligerent and the officers knew he was from Blessing's party, neither officer questioned him about Blessing's conduct. Id. at 120:19–121:21:14; (Doc. 101-3 at 141:3–6). James and Camacho transported Blessing to jail, turned him over, and had no further interaction with Blessing or his party. (Doc. 101-3 at 81:11–16); (Doc. 101-4 at 111:24–112:5). Neither officer believed Blessing was ever injured and both deny that he ever complained of pain or injuries in the time between the takedown and dropping him off at jail. (Doc. 101-3 at 140:12–14); (Doc. 101-4 at 111:13–18).

**Bray's Account**

Bray's recollection of events contradicts parts of the officers' version. She believes that she may have been turned towards the Blessing party when the officers approached, telling the Blessing party that they needed to move seats, but she also indicates that she did not interact with Blessing, nor did he argue back. (Doc. 101-5 at 54:3–9, 106:16–23, 110:7–12). When the officers arrived, Camacho approached Bray, told her she needed to see Bray's ID, and told Bray to come with her. Id. at 31:23–32:2. Meanwhile, James was "taking care of Mr. Blessing." Id. at 32:3–5. She recalls that James "put his hands on" Blessing to "make him leave his seat." Id. at 73:8–13. However, she does not remember James throwing or tackling Blessing to the floor at this point. Id. at 75:3–8. As

he was moved up the stairs and into the concourse-area landing, Bray saw Blessing "flailing," "shaking his head," "moving his body," and turning his head as if trying to talk to someone behind him. Id. at 83:5–19.

Once they reached the concessions area at the top of the stairs, Camacho asked Bray what had happened. Id. at 75:17–22; 76:7–18, 77:23–78:2. Bray told Camacho "briefly what had happened to" her. Id. at 116:25–117:1. Bray states that she never told Camacho that Blessing poured beer on her or that the second bite was in relation to the beer-pouring. Id. at 39:9–40:5; 117:2–5. She adds that she never told Camacho that Blessing struck her with his hand. Id. at 40:3–5. She disputes that she had visible bite marks on her shoulder, much less that she showed them to Camacho. Id. at 40:17–25. And finally, Bray does not recall Camacho ever asking to take any pictures or call for medical assistance. Id. at 123:10–20.

While Bray was talking to Camacho, James was about fifteen feet away with Blessing. Id. at 37:2–3, 16–25. Blessing continued shaking his head and attempted to twist around and talk to James. Id. at 36:10–11, 37:2–6. She recalls that Blessing was "resisting" and clearly "did not want to be there" and that his antics may have "started to escalate." Id. at 80:2–5. Then she saw James suddenly "pick [Blessing] up off the ground and body slam[] him into the concrete." Id. at 79:10–11. She saw James kneel on top of Blessing but does not remember seeing James put Blessing in handcuffs. Id. at 80:21–81:5. Bray did

not stay long after that or observe anything else. Id. at 37:7–15. Within minutes, she had her ID back and was back in her seat. Id. at 37:14–15, 82:17–19. When she got back to her seat, the Blessing party was gone. Id. at 86:12–17.

### The Blessing Party's Account

The Blessing party remembers things differently. After Blessing returned to his row and Koncul and Allen went up to the concessions area, Blessing recalls moving back over to the aisle seat. (Doc. 101-2 at 72:20–25). He was not arguing with Bray—indeed, nobody in the Blessing party recalls any interactions with Bray after the beer-spilling. Id. at 365:2–10; (Doc. 102-6 at 78:7–13); (102-8 at 71:1–6). Suddenly, Blessing felt a hand on his shoulder and was "pretty much being ripped from [his] seat." (Doc. 101-2 at 71:22–23). Saying "[c]ome with me, you're under arrest," James pulled Blessing into the aisle. Id. at 73:12–13, 74:13–19. Blessing expressed confusion, saying "for what?" and "what do you mean I'm under arrest?" Id. at 74:20–22. On the stairs in the aisle, James grabbed Blessing's wrist with his other hand and threw Blessing to the ground. Id. at 76:4–16, 77:1–20; (Doc. 102-7 at 18:17–23). Blessing was then brought up the stairs to the concession area. (Doc. 101-2 at 79:25, 80:7–8); (Doc. 102-7 at 18:17–23). Blessing was not passive during this encounter. (Doc. 101-2 at 75:8–13, 82:24–83:2). Blessing recalls trying to "maneuver," doing "a shoulder kind of thrust kind of thing" and "shrugging his shoulders" as he attempted to "plead [his] case." Id. at 82:25–83:15. Once in the concourse area,

11

Blessing remembers that James stopped for a minute. Id. at 87:1–4. Blessing attempted to turn around. Id. About fifteen seconds after he attempted to turn around, James took Blessing to the floor a second time. Id. at 87:19–22; (Doc. 102-7 at 18:17–23). Allen, who was in the concourse area, recalls James "picking [Blessing] up and slamming him face first on the ground." (Doc. 102-6 at 21:21–23, 23:5–7). James handcuffed Blessing on the floor with his knees on Blessing's back. (Doc. 101-2 at 89:25–90:3); (Doc. 102-7 at 18:19–23).

At this point, Allen approached James, asked what was going on, and asked if she could take Blessing home. (Doc. 102-6 at 24:3–6); (Doc. 102-8 at 74:1–4). Allen and Koncul recount that James rebuffed her with an expletive, told her that it was none of her business, and threatened to take her to jail too. (Doc. 102-6 at 24:5–7, 25:8–13); (Doc. 102-8 at 74:5–8). Allen and Koncul stayed back, but Muse followed the officers as they took Blessing away. (Doc. 102-6 at 28:13–29:2); (Doc. 102-7 at 25:6–7); (Doc. 102-8 at 75:19–76:2). Once the officers reached the loading dock area in the stadium's basement, they pushed Blessing to the floor a third time so he was lying on his back with his cuffed hands underneath him. (Doc. 102-7 at 19:3–6, 25:8–15). Muse attempted to speak with the officers, find out why they were arresting Blessing, and secure his release. Id. at 26:4–13. Muse recalls the officers shouting profanity at him, telling him to leave, and then being forced out of the stadium through a side door. Id. at

27:15–25, 84:17–85:7. Eventually, Muse, Allen, and Koncul met up, left the concert, and headed to the jail. Id. at 28:14–17; (Doc. 102-8 at 75:19–76:2).

Blessing's arrest report indicates that he was arrested for Battery and Resisting An Officer Without Violence. (Doc. 102-9 at 1). He was subsequently charged by information with Resisting an Officer Without Violence and Disorderly Intoxication. (Doc. 102-10). All charges were ultimately dismissed. (Doc. 101-2 at 375:19–23, 376:9–16).

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe all evidence in a light most favorable to Blessing. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014) (citations omitted).

### A. Counts I and II as to James and Camacho

Blessing brings claims under 42 U.S.C. § 1983 alleging that James and Camacho violated his Fourth and Fourteenth Amendment rights. In Count I, Blessing alleges that James used excessive force when he took Blessing to the ground. (Doc. 42 at ¶ 53). In Count II, Blessing alleges that James and Camacho committed false arrest by arresting him without probable cause. Id. at ¶ 57–59. James and Camacho argue that their actions that night were proper and that

they are protected by qualified immunity. (Doc. 102 at 11–24). The officers argue that they did not falsely arrest Blessing because they <u>did</u> have probable cause. <u>Id.</u> at 12–18. And, having probable cause, James could use reasonable force to make that arrest. <u>Id.</u> at 18–24. Because James' takedown of Blessing was reasonable and proportional considering Blessing's resistance, James argues that the force was not excessive. <u>Id.</u> at 20–24.

### 1. False Arrest

Beginning with Count II, "[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." <u>Ortega v. Christian</u>, 85 F.3d 1521, 1525 (11th Cir. 1996). However, a government official may defeat a false arrest claim in two ways. First, an officer may assert qualified immunity, which provides a shield from suit. <u>Estate of Cummings v. Davenport</u>, 906 F.3d 934, 939–40 (11th Cir. 2018) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). To establish qualified immunity, the government official first must show that "he was acting within the scope of his discretionary authority." <u>Estate of Cummings</u>, 906 F.3d 934 at 940 (quotations omitted). The burden then shifts to the plaintiff to show that the government official violated a "clearly established statutory or constitutional right[] of which a reasonable person would have known." <u>Harlow</u>, 457 U.S. at 818; <u>Reese v. Herbert</u>, 527 F.3d 1253, 1272 (11th Cir. 2008). Second, even if the government official's qualified immunity defense fails, he may still defeat a false arrest

claim on the merits by establishing probable cause, which "constitutes an absolute bar to a section 1983 action for false arrest." Ortega, 85 F.3d at 1525.

At the outset, the Court notes that James and Camacho do not address and Blessing does not dispute whether they acted within their discretionary authority.[2] Rather, the parties jump straight to whether James and Camacho violated Blessing's rights, so here the Court will begin. See (Doc. 102 at 12); (Doc. 104 at 17).

"An officer sued for having made an arrest without probable cause is entitled to qualified immunity if there was arguable probable cause for the arrest, which is a more lenient standard than probable cause." Knight v. Jacobson, 300 F.3d 1272, 1274 (11th Cir. 2002). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007) (quotation and alterations omitted). Although the less strict arguable probable cause

---

[2] Blessing previously argued at the motion to dismiss stage that James and Camacho did not act within their discretionary authority because they did not have probable cause to arrest Blessing. (Doc. 29 at 13–14); see Lester v. City of Tavares, 603 So. 2d 18, 19 (Fla. 5th DCA 1992) ("[A] police officer does not have the discretionary authority to arrest a citizen whom the officer does not have probable cause to believe has committed an offense."). However, as in the Court's prior Order denying James and Camacho's motion to dismiss, the Court notes that this argument is subsumed by its broader analysis of probable cause. See (Doc. 36 at 5).

standard "recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause," it still "does not shield officers who <u>unreasonably</u> conclude that probable cause exists." <u>Id.</u> To determine probable cause, the "collective knowledge of the investigating officers" may be "imputed to each participating officer." <u>Terrell v. Smith</u>, 668 F.3d 1244, 1252 (11th Cir. 2012).

### i. Battery

Based on the facts here, the officers might not have acted reasonably when they arrested Blessing for battery.[3] Battery occurs when a person "[a]ctually and intentionally touches or strikes another person against the will of the other; or [i]ntentionally causes bodily harm to another person." FLA. STAT. § 784.03(1)(a). Here, it is undisputed that Bray told Camacho that Blessing bit her twice, and no party disputes that biting a stranger constitutes battery. The officers thus argue that Bray's accusation was sufficient to establish probable cause or arguable probable cause because her accusation was supported by physical evidence: the bite marks on her shoulder. (Doc. 102 at 14–15). But Bray

---

[3] The parties do not agree on when Blessing was arrested. Blessing argues that he was constructively arrested when the officers first encountered and interacted with him at his seat area. (Doc. 104 at 9–10). The officers argue that he was arrested in the concourse area after Camacho interviewed Bray. (Doc. 110 at 2–3). The Court does not reach this argument because the facts conflict over whether the officers <u>ever</u> had probable cause or arguable probable cause.

16

is adamant that she did not have—nor did she show Camacho—any bite marks. (Doc. 101-5 at 40:17–25). Admittedly, physical evidence, such as bite marks, is not essential to establishing probable cause for battery. See Huebner v. Bradshaw, 935 F.3d 1183, 1188–89 (11th Cir. 2019). But "reasonably trustworthy" information is essential. Id. at 1187. And looking at the undisputed facts, it is not clear that the officer's information met that mark.

For example, putting aside the bite marks dispute, the parties agree that the officers relied solely on Bray's accusation that Blessing bit her, without interviewing any eyewitnesses. (Doc. 101-4 at 104:1–16); (Doc. 102 at 16–17); (Doc. 104 at 11). Granted, relying on the victim's testimony alone is not necessarily unreasonable. For instance, in Huebner, police officers made a valid battery arrest solely based on the victim's account. 935 F.3d at 1188–89. But in Huebner, the police were able to rely on the victim's two sworn statements and her 911 call—all consistent with each other. Id. In contrast, Bray offered no sworn or written statements. See (Doc. 101-4 at 101:14–15) ("[Bray] didn't want to provide anything. She didn't provide a written statement.").

Similarly, in Richmond v. Badia, a police officer had arguable probable cause to arrest a boy for shoving his mother after two eyewitnesses reported the battery. No. 20-14337, 2022 WL 3581305, at *4 (11th Cir. Aug. 22, 2022). But

here, no eyewitnesses reported a battery[4]—indeed, the eyewitnesses in this case say they tried to <u>exculpate</u> Blessing. Allen says she identified herself and tried to talk to the officers. (Doc. 102-6 at 84:6–25). Muse says he tried to do the same. (Doc. 102-7 at 19:3–9). But neither officer was interested in hearing from them. <u>Id.</u>; (Doc. 102-6 at 84:6–21).

Of course, the officers remember these encounters differently—Allen was intoxicated and belligerent, and Muse made no attempt to defend Blessing. (Doc. 101-3 at 141:3–20); (Doc. 101-4 at 95:1–18). This conflict cannot be resolved at summary judgment. If the Blessing party's account is correct, the officers "elect[ed] not to obtain easily discoverable facts" by "choos[ing] to ignore information that ha[d] been offered" to them, making the investigation and subsequent arrest unreasonable. <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1229 (11th Cir. 2004), <u>abrogated on other grounds by</u> <u>Williams v. Aguirre</u>, 965 F.3d 1147 (11th Cir. 2020) (an officer may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts").

Thus, under one view of the facts, the only evidence that the officers had was that Bray told Camacho that Blessing had bitten her twice. However, Bray refused to make a statement—much less a sworn one like in <u>Huebner</u>—

---

[4] The SMG employee reported an "altercation," which Camacho understood to be a non-physical argument. (Doc. 101-4 at 107:14–24).

regarding the matter, and she specifically denies that she showed the officers bite marks or told the officers that Blessing struck her with his hand. Of course, the officers dispute each of these points, and the arrest report—brimming with statements Bray says she did not make—tells a different story. (Doc. 102-9 at 2). But based on these conflicting facts, the Court cannot find that as a matter of law the officers had actual or arguable probable cause to arrest Blessing for battery.

### ii. Disorderly Intoxication and Resisting An Officer

The officers also argue that, even if they did not have probable cause or arguable probable cause to arrest Blessing for battery, they otherwise had sufficient evidence to arrest him for disorderly intoxication and resisting an officer without violence. (Doc. 102 at 17–18); see Wilkerson v. Seymour, 736 F.3d 974, 979 (11th Cir. 2013) ("[A]n arrest may be for a different crime from the one for which probable cause actually exists . . . but arguable probable cause to arrest for some offense must exist in order for officers to assert qualified immunity from suit.") (citation omitted).[5] Here, as with battery, the facts conflict too significantly for the Court to find that as a matter of law the officers had arguable or actual probable cause to arrest for either offense.

---

[5] Blessing's arrest record shows he was arrested for Battery and Resisting an Officer Without Violence, but not Disorderly Intoxication. (Doc. 102-10 at 3).

Starting with disorderly intoxication, Blessing claims that he was not intoxicated that evening. (Doc. 101-2 at 359:12–15). He had to work early the next morning, so he only had two vodka tonics and two beers over the course of the evening. Id. at 50:19–21; 359:6–9. James and Bray recall Blessing appearing so drunk that James had to help him up the stairs. (Doc. 101-3 at 60:12–15, 66:9–15); (Doc. 101-5 at 28:1–16). But Muse recalls Blessing was supported because he had been thrown to the floor—not because he was drunk—and states that none of the Blessing party drank to excess or appeared intoxicated. (Doc. 102-7 at 18:19–23, 68:4–9, 69:24–70:1, 85:18–25). Because the facts conflict over whether Blessing was or appeared intoxicated, the Court cannot find that the officers had arguable or actual probable cause to arrest for disorderly intoxication. Cf. Jernigan v. State, 566 So. 2d 39, 40 (Fla. 1st DCA 1990) (clarifying that disorderly intoxication requires intoxication and danger to the public and finding no disorderly intoxication even where an arrestee resisted arrest and "put one of the officers in a headlock and ripped his shirt"); Blake v. State, No. AN-280, 1983 Fla. App. LEXIS 19336, at *1–2 (Fla. 1st DCA May 6, 1983) (no disorderly intoxication even where defendant smelled of alcohol, flapped his arms almost hitting the officers, loudly used profanity, and caused a disturbance).

Likewise, a defendant resists an officer without violence if "(1) the officer was engaged in the lawful execution of a legal duty; and, (2) the actions of the

defendant obstructed, resisted[,] or opposed the officer in the performance of that legal duty." A.W. v. State, 82 So. 3d 1136, 1138 (Fla. 4th DCA 2012) (citation omitted). However, "[i]f an arrest is unlawful, 'a defendant cannot be guilty of resisting it' without violence." Jackson v. State, 192 So. 3d 541, 543 (Fla. 4th DCA 2016) (quotation omitted). And here, as discussed above, whether the officers even had arguable probable cause to arrest Blessing is disputed. If, under one view of the facts, the officers could not reasonably have thought they had probable cause to arrest Blessing, it logically follows that they could not reasonably believe they were lawfully arresting Blessing.

Because the facts conflict over the threshold question of arguable probable cause—which is a lesser standard than actual probable cause—the officers are not entitled to qualified immunity at this stage, nor is the § 1983 false arrest claim otherwise barred. See Knight, 300 F.3d at 1274; Ortega, 85 F.3d at 1525. Thus, because there is a factual question for the jury, the Court will deny Camacho and James' motion for summary judgment on Count II.

## 2. Excessive Force

Turning next to Count I, against James only, for excessive force, the Court must also deny James' motion for summary judgment. An officer is entitled to "use some force" when making a lawful arrest. Brown v. City of Huntsville, 608 F.3d 738, 740 (11th Cir. 2010). Whether the force used by the officer is

reasonable or excessive depends on the individual circumstances of the arrest. Graham v. Connor, 490 U.S. 386, 396 (1989).

Excessive force claims take two forms: "artificial" and "genuine." Richmond, 2022 WL 3581305, at *3–4. If officers make an arrest without probable cause, any use of force to effectuate that false arrest is per se unreasonable and therefore excessive. See Reese, 527 F.3d at 1272–73; Nolin v. Isbell, 207 F.3d 1253, 1258 (11th Cir. 2000). Such claims "that force was excessive merely because another Fourth Amendment violation occurred" are artificial excessive force claims. Richmond, 2022 WL 3581305, at *3 (citations omitted). These are not treated as "discrete excessive force claim[s]" but are rather "subsumed" into the false arrest claim. Id. (quoting Jackson v. Sauls, 206 F.3d 1156, 1171 (11th Cir. 2000). The "damages suffered because of the use of force in effecting the arrest" are thus recoverable as part of the false arrest claim. Williamson v. Mills, 65 F.3d 155, 158–59 (11th Cir. 1995) (citations omitted); see Williams v. Sirmons, 307 F. App'x 354, 360 (11th Cir. 2009).

On the other hand, genuine excessive force claims are independent of and analyzed separately from underlying Fourth Amendment violations, such as false arrest. Richmond, 2022 WL 3581305, at *3. To analyze genuine excessive force, courts look to "the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." Id. (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008).

Here, there is at least enough for an artificial excessive force claim. The facts conflict over whether James and Camacho had probable cause to arrest Blessing or are eligible for qualified immunity. See supra, Section II.A.1. If the officers arrested Blessing without probable cause, James' use of force was unreasonable and would satisfy an artificial excessive force claim. See Reese, 527 F.3d at 1272.

But Blessing bases his excessive force count on more than an artificial claim: he alleges that a separate Fourth Amendment violation occurred when James "violently seiz[ed]" him, used an "arm bar to take him to the ground," broke Blessing's arm and "injur[ed] his spinal cord." (Doc. 42 at ¶ 53). Here, too, the conflicting facts prevent the Court from deciding this issue at the summary judgment stage.

When determining whether the force used in an arrest independently violates the Fourth Amendment, courts consider "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Richmond, 2022 WL 3581305, at *5 (citing Graham v. Connor, 490 U.S. 386, 396 (1989). On the one hand "unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions" is excessive. Richmond, 2022 WL 3581305, at *5 (quoting Fils v. City of Aventura, 647 F.3d 1272, 1289 (11th Cir. 2011). On the other hand, for

example, an outnumbered officer uses reasonable force when tackling and tasing an actively-resisting arrestee during a tense, late-night gas station encounter. <u>Charles v. Johnson</u>, 18 F.4th 686, 700 (11th Cir. 2021).

The contested facts here could support either side. For example, the parties cannot agree on whether Blessing was thrown to the floor in the stairs before Camacho had interviewed Bray, the degree to which Blessing was struggling and resisting, what the officers knew about Blessing's alleged violent conduct that evening, and whether James "body-slammed" Blessing or used a smooth and efficient arm-bar takedown to handcuff him without fuss. <u>See, e.g.</u>, (Doc. 101-2 at 86:18–87:22); (Doc. 101-4 at 99:18–100:1, 111:2–9); (Doc. 101-5 at 36:6–11, 79:9–11); (Doc. 102-7 at 18:17–23, 55:8–15). These conflicts cannot be resolved here, so the Court will deny James' motion for summary judgment on Count I.

### B. Counts III–V as to Sheriff Williams

In Count III, Municipal Liability, Blessing alleges that Williams, in his official capacity as Sheriff of the City of Jacksonville, Florida, violated the Fourth and Fourteenth Amendments through a series of policies that culminated in Blessing's arrest and injury. (Doc. 42 at ¶¶ 61–63). In Counts IV and V, State Law Battery and False Imprisonment, Blessing alleges that the Sheriff is liable under state law for offenses committed by James and Camacho when they arrested Blessing. <u>Id.</u> at ¶¶ 64–72. Although the Court agrees with

the Sheriff that Count III fails, Counts IV and V cannot be resolved at the summary judgment stage.

### 1. Municipal Liability

A suit against Williams, as the Sheriff of Jacksonville, is effectively a suit against the City of Jacksonville itself. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005). Although municipalities may be sued under § 1983, they cannot be held vicariously liable for their employees' actions. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Rather, the municipality itself must commit the purported § 1983 violation. Id. at 692. Thus, a plaintiff must show first that he suffered a constitutional deprivation under "color of state law" and second that the deprivation was the result of "an official government policy, the action[] of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno v. Sch. Bd. of Volusia Cnty., 218 F.3d 1267, 1276 (11th Cir. 2000); see Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276–77 (11th Cir. 2003) (citation omitted).

At the outset, the Sheriff argues that Blessing did not suffer a constitutional deprivation, thus defeating Blessing's § 1983 claim. (Doc. 101 at 10–12). However, as discussed above, the facts conflict on whether James and Camacho violated the constitution when they arrested Blessing. See supra, Section II.A. So the Court turns to the second step of the municipal liability

analysis: whether the Sheriff caused the purported constitutional violations. See Focus on the Family, 344 F.3d at 1276–77.

Blessing alleges several closely related theories of municipal liability. First, he argues that the Sheriff "instituted and followed practices, customs[,] and policies[,] which directly resulted in use of excessive force" and Blessing's "false arrest." (Doc. 42 at ¶ 62). He further alleges that "[t]he Sheriff's Office has a widespread custom and practice of using excessive force and falsely arresting citizens" which the Sheriff has ratified "by failing to discipline [his] officers." Id.[6]

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). Likewise, "[a] custom is a practice that is so settled and permanent that it takes on the force of law." Id. Here, Blessing does

---

[6] Blessing alternatively alleges that James and Camacho were final policymakers for the municipality because "their decisions were not immediately or effectively reviewable." (Doc. 42 at ¶ 62). Neither the Sheriff nor Blessing addresses this theory at summary judgment. However, "[n]o final policymaking authority exists where the official's decisions are subject to, or constrained by, 'meaningful administrative review.'" Samarco v. Neumann, 44 F. Supp. 2d 1276, 1286 (S. D. Fla. 1999) (quoting Morro v. City of Birmingham, 117 F.3d 508, 514 (11th Cir. 1997)). Here, the facts are undisputed that JSO deputies' arrest and use-of-force powers are defined by JSO policies and subject to administrative review. See (Doc. 101-6 at ¶ 3–4).

not argue, nor does the evidence suggest, that the Sheriff's office has an official policy directly permitting constitutional violations. Thus, Blessing must establish that the Sheriff has a custom of permitting constitutional violations. See id.; Grech v. Clayton Cnty., 335 F.3d 1326, 1330 (11th Cir. 2003).

Beginning with false arrest, Blessing's complaint alleges that the Sheriff's office has a custom or policy of allowing false arrests. (See Doc. 42 at ¶¶ 45, 48, 49) (alleging three false arrests by JSO officers within the ten years preceding Blessing's arrest). However, Blessing does not address false arrest at summary judgment or point to any evidence showing that the Sheriff has a policy—officially adopted or otherwise—of permitting false arrests. See (Doc. 105); but see (Doc. 105-11 at 53:21–54:3) (Sheriff's deposition testimony explaining the department's policy against false arrest). So to the extent that his municipal liability claim is premised on false arrest, Blessing's claim fails. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

Turning to excessive force, Blessing argues that there is record evidence of a JSO custom or practice of permitting such constitutional violations. See (Doc. 105 at 18–19). He first attempts to show a custom by identifying other cases where JSO officers have been accused of excessive force. In his complaint, Blessing identifies two instances in 2015 and one instance in 2017 where James

used violence against other arrestees. (Doc. 42 ¶¶ 34, 36, 39). He also identifies eleven instances, from 2004 to 2017, where JSO officers used violence against arrestees. Id. at 42 ¶¶ 41–51. These examples, Blessing alleges, cumulatively show a widespread JSO practice of violence against arrestees. Id. at ¶ 40.

The Sheriff argues that the cumulative allegations of JSO officers' use of force, without more, are insufficient at the summary judgment stage. (Doc. 101 at 18–19). The Sheriff notes that Blessing has not demonstrated that these past complaints were valid or meritorious. Id. at 19; see Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987). Indeed, Blessing does not address the cumulative cases from his complaint in his response to the Sheriff's motion for summary judgment. See (Doc. 105); cf. (Doc. 101-6 at ¶ 7) (refuting Blessing's assertion that "there was no discipline or reprimand against the officers" after JSO found misconduct).

Instead, Blessing focuses on James' disciplinary background. (Doc. 105 at 11–15). Blessing identifies a series of James' social media posts from early 2016 containing apparently violent, threatening, and angry language. Id. at ¶¶ 37(a)–(i); (Doc. 105 at 8). No party disputes that these events occurred or that JSO investigated and disciplined James for each of these incidents. See (Doc. 105 at 12–14); (Doc. 101-6 at ¶¶ 6–8).[7]

---

[7] Blessing also alleges two use of force complaints against James during

28

Nevertheless, Blessing argues that JSO's response to James' social media posts was insufficient. (Doc. 105 at 12). After the social media posts were discovered, JSO removed James from his regular duties while they investigated. (Doc. 101-6 at ¶ 10). James was required to undergo psychological testing to determine whether he was fit for police duty. Id. Blessing argues that the psychologist's evaluation was inadequate, suggesting that the doctor was not sufficiently critical of James. (Doc. 105 at 12–13). The Court notes the Sheriff's argument that Blessing appears to read too much into the doctor's deposition answers to support this point.[8] (Doc. 111 at 4). But the biggest problem with Blessing's argument is he fails to present any evidence or authority—beyond conclusory statements in his opposition—that the

---

his first two years on the force. (Doc. 42 at ¶¶ 34, 36). The Sheriff disputes that there is any record evidence of the two use of force complaints against James. (Doc. 101 at 16 n.4). And Blessing effectively concedes he has no evidence of these incidents. See (Doc. 105 at 16) (conceding that these purported reports are "no longer in the concise history" and offering no other evidence).

[8] For example, Blessing argues that the doctor "accepted whatever James told him" such as accepting as true that James "was not unnecessarily violent in handling matters." (Doc. 105 at 12). The doctor's actual answer to this question was much more reserved:

> A:    . . . I believe I asked [James] in general if he gets excitement or if he, you know, is unnecessarily violent in his handling of matters and he said no.
>
> Q:    Okay. And so because he said no, you accepted that?
>
> A:    I accepted that he said no.

(Doc. 105-13 at 72:19–25).

investigation, evaluation, and subsequent reprimand were inadequate. <u>See</u> (Doc. 105). To the contrary, the evidence shows that James' concerning posts drew a quick response, that James was removed from patrol duty while they were investigated, and he underwent a psychological examination before returning to duty. <u>See</u> (Doc. 101-6 at ¶ 10); (Doc. 105-13 at 85:4–25) (psychologist's testimony that James passed all his psychological tests and was fit to return to duty).

Accordingly, Blessing's municipal liability claim against the Sheriff cannot survive. Blessing has not established a custom or practice of constitutional violations by JSO officers generally or James specifically. <u>Ellis</u>, 432 F.3d at 1326 (unsupported allegations and conclusions are insufficient to defeat summary judgment). Nor has he shown that the Sheriff failed to discipline officers for violations. To the contrary, the evidence shows that James was investigated and disciplined when he stepped out of line, under department-wide policies. Consequently, the Court will grant the Sheriff's motion for summary judgment on Count III.[9]

---

[9] Blessing also discusses JSO's treatment of James' arrest of and use of force against Blessing, arguing that the subsequent investigation and disciplinary process were insufficient. (Doc. 105 at 15). Ordinarily, a municipality's actions after the purported constitutional violation are irrelevant for establishing a custom or practice <u>that harmed</u> the plaintiff. <u>See</u> <u>Connick v. Thompson</u>, 563 U.S. 51, 63 n.7 (2011) ("[C]ontemporanous or subsequent

### 2. State Law Battery and False Imprisonment

Turning next to Counts IV and V, the Sheriff argues that Blessing's allegations of battery and false imprisonment against the Sheriff should not proceed. (Doc. 101 at 22–24). Under Florida's limited waiver of sovereign immunity, the Sheriff may be sued for torts committed by his employees within the scope of their employment. FLA. STAT. § 768.28(1); see Richardson v. City of Pompano Beach, 511 So. 2d 1121, 1124 (Fla. 4th DCA 1987).

In Count V, Blessing sues the Sheriff for false imprisonment, which consists of "1) the unlawful detention and deprivation of liberty of a person 2) against that person's will 3) without legal authority or 'color of authority' and 4) which is unreasonable and unwarranted under the circumstances." Montejo v. Martin Mem'l Med. Ctr., Inc., 935 So. 2d 1266, 1268 (Fla. 4th DCA 2006) (citations omitted); (Doc. 42 at ¶¶ 69–72). The Sheriff argues this claim fails because James and Camacho had probable cause to arrest Blessing. (Doc. 101 at 23–24). However, as already discussed, whether James and Camacho had probable cause is a disputed question of fact. See supra, Section II.A.1; Mathis

---

conduct cannot establish a pattern of violations that would provide 'notice to the [municipality] and the opportunity to conform to constitutional dictates . . . .'") (citation omitted). To the extent the Court construes this portion of Blessing's argument as a theory of ratification, this argument also fails. See Salvato v. Miley, 790 F.3d 1286, 1296 (11th Cir. 2015) (holding that failure to investigate a single constitutional violation does not constitute ratification).

v. Coats, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010) (stating that false arrest is "one of several methods of committing false imprisonment"). Thus, the Court will deny the Sheriff's motion for summary judgment on Count V.

Similarly, in Count IV, Blessing alleges that, because of the force James used to arrest Blessing, the Sheriff is liable for battery. (Doc. 42 at ¶¶ 64–68). Under Florida law, "[i]f excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (citation omitted). The Sheriff argues that the force James used against Blessing was reasonable and not excessive. (Doc. 101 at 22–23). However, as discussed above, the facts conflict over whether James used excessive force. See supra, Section II.A.2. Accordingly, the Court will deny the Sheriff's motion for summary judgment on Count IV.

## C.    Count VI as to ASM Global

In Count VI, Blessing sues ASM Global, which does business as SMG, for negligent hiring. (Doc. 42 at ¶¶ 73–79). Blessing alleges that SMG failed to properly investigate or vet James and Camacho, who were hired off-duty to work security at the concert venue SMG managed. Id. Contrary to these allegations, SMG argues that it was not James and Camacho's employer, so it is not subject to a negligent hiring claim. (Doc. 98 at 6–8). The Court agrees. Because Blessing has not shown an employer-employee relationship between

SMG and the off-duty officers working its events, the Court will grant SMG's motion for summary judgment.

To establish a claim for negligent hiring under Florida law, a plaintiff must prove three elements:

> (1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known.

Malicki v. Doe, 814 So. 2d 347, 362 (Fla. 2002) (citation omitted). Crucially, an employer-employee relationship is necessary to establish negligent hiring—an agency relationship is insufficient. Pierson v. Orlando Reg'l Healthcare Sys., Inc., 619 F. Supp. 2d 1260, 1286 (M.D. Fla. 2009), aff'd, 451 F. App'x 862 (11th Cir. 2012) (citations omitted).

The parties generally agree on the applicable facts. Jacksonville Municipal Ordinance Title VI, § 191.113(a) states that "[t]he Jacksonville Sheriff's Office shall be the primary provider of personal safety and property security at special events." Special events include gatherings of five hundred or more attendees. § 191.102(b). Event organizers may use private security, but "such entities [are] supplemental or in addition to the services provided by the Office of the Sheriff." § 191.113(a). Any event organizers "required to have

33

Personal Safety and Property Security" at their events "shall arrange for JSO personnel based upon projected attendees and participants." § 191.115(a). The ordinance provides a matrix determining the number of JSO officers required based on the number of attendees. Id. And the ordinance requires that "for every six (6) JSO personnel assigned to cover an event, there also shall be assigned JSO supervisors" according to another matrix. § 191.115(d). "The costs for provision of Jacksonville Sheriff's Office . . . personnel at special events . . . shall be the current regular prevailing hourly rates . . . ." § 191.116.

Under the special events ordinance, event organizers customarily contact the Sheriff's office at least thirty days before events. (Doc. 103-12 at 9:11–20). JSO then "dictate[s] how many officers [and] supervisors" are necessary. Id. at 9:18–20. JSO circulates an internal email informing officers of the event and giving them a deadline to apply to volunteer. Id. at 10:1–7. Eligible volunteers are selected on a first-come, first-served basis. Id. at 19:13–15. A JSO employee, the Secondary Employment Officer, notifies officers if they have been selected and assembles the secondary employment roster for each event. Id. at 14:20–15:15. Generally, any active, sworn police officer is eligible for secondary employment. Id. at 15:13–15. However, an officer may be ineligible for secondary employment if he has administrative action, criminal action, or other discipline pending against him. Id. at 17:8–20.

The Secondary Employment Officer provides the list of assigned officers to the event organizer on the day of the scheduled event. (Doc. 103-6 at 17:7–8). SMG has hosted numerous events requiring JSO officers but has never independently investigated the officers provided by JSO. Id. at 26:7–21; see (Doc. 103-12 at 11:3–4, 11–13). However, there is no prohibition against SMG requesting the names or backgrounds of the officers who will work at the events. (Doc. 103-12 at 36:23–37:7).

At the 2016 Pearl Jam concert, James and Camacho worked as off-duty officers through JSO's secondary employment program. See (Doc. 103-8 at 133:4–13); (Doc. 103-7 at 118:9–21). At the event, they were briefed and given their instructions by a JSO sergeant. (Doc. 103-7 at 53:10–54:15, 55:22–56:7, 11–22). After the SMG employee alerted Camacho and James to the Blessing and Bray incident, the officers alone decided to arrest Blessing, and no SMG employee was involved after the arrest. (Doc. 103-8 at 138:18–24, 139:3–11). After the event, James and Camacho were paid "city overtime" through their regular JSO paychecks. Id. at 44:10–14, 76:17–25.

Although the parties agree on these facts, they disagree on their legal significance. Blessing argues the language of the ordinance does not preclude an employer-employee relationship, nor was SMG prevented from being more involved in vetting the officers and directing their activities. (Doc. 103 at 10–13). However, just because SMG could do more does not meant they must,

35

absent an employment relationship. See Malicki, 814 So. 2d at 362. Similarly, Blessing points to JSO's general order on secondary employment, specifically language stating that "JSO employees who work secondary employment for a third party employer are not acting as employees of the City of Jacksonville." (Doc. 103-14 at 1). However, it does not necessarily follow that, because James and Camacho were not acting as city employees, they were therefore employees of the event organizer. And beyond these speculative claims, Blessing offers no evidence that the officers and SMG had an employer-employee relationship.

To the contrary, Florida's employee-employer test looks to the relationship the parties did have, not the relationship they theoretically could have had. See Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1318–19 (11th Cir. 2015) (citing Restatement (Second) of Agency § 220(2)).[10]

---

[10] Florida courts generally consider the following non-exhaustive list of factors to determine whether an employer-employee relationship exists:

> (a) the extent of control which, by the parties' agreement, the employer exercises over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skills required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work;

Blessing does not identify facts that relate to these employment factors. <u>See</u> (Doc. 103). Indeed, the undisputed facts indicate SMG did not exercise control over the off-duty officers and that neither SMG nor the officers believed they had an employer-employee relationship—two factors indicating a non-employee relationship. <u>See</u> Carlson, 787 F.3d at 1318–19; (Doc. 103-6 at 31:7–9); (Doc. 103-7 at 132:5–16, 134:7–20). Because Blessing has not shown facts suggesting an employment relationship, his negligent hiring claim cannot survive. <u>Pierson</u>, 619 F. Supp. 2d at 1286. So the Court will grant ASM Global's motion for summary judgment on Count VI.

**D.    The Sheriff's <u>Daubert</u> Motion as to Proposed Expert Dan Brown**

Finally, the Court addresses the Sheriff's <u>Daubert</u> Motion to Exclude Testimony of Plaintiff's Expert, Dan Brown. (Doc. 100). Blessing offers Dan Brown as a police practices expert. <u>Id.</u> at ¶ 2. Brown opines 1) that "Jacksonville Sheriff's Office [JSO] and Officer Timothy James failed to follow" use of force

---

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe that they are creating the relation of master and servant; and

(j) whether the principal is or is not a business.

<u>Carlson</u>, 787 F.3d at 1318–19.

standards which are "well-accepted standards for law enforcement agencies in the United States;" 2) JSO "had a duty and obligation to recognize [James'] early warning signs;" 3) "James used excessive force to effect a false arrest for which probable cause did not exist;" and 4) JSO negligently failed to "properly discipline and supervise" James, whose "record of dishonesty and excessive force should have been a red flag." (Doc. 100-1 at 277–78). The Sheriff moves to exclude these opinions and prevent Brown from testifying at trial. (Doc. 100 at 2–3).

### 1. Rule 702 Standard

Under Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702(a)–(d). The party offering the expert testimony bears the burden of showing its admissibility by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert v.

Merrell Dow Pharm., Inc., 509 U.S. 579, 592 n.10 (1993)). Courts act as

gatekeepers, screening the evidence to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of

Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir.1998)). Here,

the Sheriff attacks Brown's qualifications, the reliability of Brown's opinions,

and their relevance and helpfulness. See (Doc. 100). The Court will consider

each in turn.

### 2. Brown's Qualifications

An expert witness may be qualified "based upon knowledge, skill,

experience, training, or education." Feliciano v. City of Miami Beach, 844 F.

Supp. 2d 1258, 1262 (S.D. Fla. 2012) (citing Frazier, 387 F.3d at 1260–61).

Courts assess qualifications by "examin[ing] the credentials of the proposed

expert in light of the subject matter of the proposed testimony." Id. (quotation

omitted). "This inquiry is not stringent, and so long as the expert is minimally

qualified, objections to the level of the expert's expertise [go] to credibility and

weight, not admissibility." Id. (quoting Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012)).

Brown's education, experience, and training sufficiently qualify him. His resume shows that he has several degrees in law enforcement and management-related fields and is completing his Ph.D. in criminal justice leadership. (Doc. 100-1 at 268). As a founding member and former Vice Chairman of the Arizona Law Enforcement Accreditation Program, he is experienced with law enforcement best practices and the accreditation requirements imposed on police departments. Id. at 81:11–82:9, 269. He personally spent over two decades in law enforcement, with experiences as a patrol officer, a training sergeant, and ultimately seven years as a Chief of Police. Id. at 35:22–36:1, 268–269. He has trained both new recruits and experienced police officers Id. at 38:3–14, 43:16–22. Although he is admittedly not "a defensive tactics expert," he has also participated in training officers on "handcuffing techniques," and "impact pushes." Id. at 49:15–50:3, 122:7–8.

Considering Brown's extensive background in law enforcement, the Court finds that he is qualified to render expert opinions on law enforcement practices, as well as Blessing's claims of false arrest, false imprisonment, excessive force, and battery. See, e.g., Feliciano, 844 F. Supp. 2d at 1263 (finding that a proposed expert, with decades of experience ranging from patrol duty to acting police chief, was qualified to opine on police practices generally, as well as the

specific police practices in that case); <u>Washington v. City of Waldo</u>, No. 1:15CV73-MW/GRJ, 2016 WL 3545909, at *1–2 (N.D. Fla. Mar. 1, 2016) (finding that a proposed expert with decades of law enforcement and supervisory experience, training, and upper-level education was qualified to opine on "claims of false arrest, battery, excessive force, and negligent hiring and retention").

The Sheriff challenges Brown's familiarity with police procedure and criminal law in Florida, noting that Brown worked for comparatively smaller police departments in a different state. (Doc. 100 at 17–21). However, Brown has such an extensive background and education in policing that he is at least minimally qualified; these objections are more properly explored on cross examination. <u>See</u> <u>Feliciano</u>, 844 F. Supp. 2d. at 1263 (holding that unfamiliarity with certain policing techniques and weaknesses in proposed opinions did not negate an expert's qualification and could be exploited on cross examination).

### 3.  Reliability

Even if a witness is qualified as an expert, his opinions must also be reliable. <u>Daubert</u>, 509 U.S. at 589. Courts have "'broad latitude' when deciding exactly '<u>how</u> to determine reliability.'" <u>Washington</u>, 2016 WL 3545909, at *3 (quoting <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 142 (1999)). Case law provides, within the context of scientific experts, non-exhaustive factors a district court may consider. <u>See</u> <u>Seamon v. Remington Arms Co., LLC</u>, 813 F.3d

983, 988 (11th Cir. 2016).[11] But the most important test of an experience-qualified non-scientific expert's reliability is that "the expert must be able to explain 'how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Washington, 2016 WL 3545909, at *3 (quoting FED. R. EVID. 702, Advisory Committee Notes (2000)).

Here, Brown relies on his experience, his review of relevant caselaw, and this case's evidentiary record. (Doc. 100-1 at 267–270). He explains that he reviewed deposition testimony and JSO policies, procedures, and reports. Id. at 269–70. He analyzed this evidence using factors derived from International Association of Chiefs of Police publications, case law from the United States Supreme Court, and his own experience in creating and enforcing policing policies and procedures. Id. at 270–278. Such methodology is routinely accepted. See Washington, 2016 WL 3545909, at *3 (collecting cases).

---

[11] For example, courts may consider:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community.

Seamon, 813 F.3d at 988 (citations omitted).

The Sheriff argues that Brown's opinions are unreliable because they are "not based on sufficient facts." (Doc. 100 at 17–22). The Sheriff notes that Brown had not read JSO's Internal Affairs early-warning system policy before his deposition. Id. at 11–12. Further, Brown testified at his deposition that he had not read the parties' and witnesses' depositions in full, relying instead on summaries and excerpts provided by Blessing's attorney. (Doc. 109 at 2–3); (Doc. 100-1 at 69:17–72:1). Finally, the Sheriff challenges Brown's understanding of Florida law, noting that Brown appeared to conflate the concepts of assault and battery and did not properly articulate the probable cause standard for battery. (Doc. 100 at 18–20).[12] While Brown's preparation was perhaps questionable, it does not necessarily make his opinions unreliable. As in similar cases, Brown "used his law enforcement experience, knowledge, and training in police practices, including his review of court cases, and evaluated the facts of the instant case to form his opinions." Washington, 2016 WL 3545909, at *3. The Sheriff may attack Brown's "credibility and the validity of his conclusions . . . during cross-examination." Shew v. Howvath, No. 8:16-cv-766-T-33JSS, 2017 WL 632515, at *6 (M.D. Fla. Feb. 16, 2017); see

---

[12] The Sheriff raised Brown's understanding of Florida law to attack his qualifications—not necessarily the reliability of his methods. See (Doc. 100 at 18–20). The Court re-addresses these arguments here for completeness. See Feliciano, 844 F. Supp. 2d at 1264–65 (discussing a proposed expert's lack of particularized knowledge while determining reliability).

Washington, 2016 WL 3545909, at *2 (finding that "cross-examination, rather than outright exclusion, is the more appropriate method of challenging [a proposed expert's] allegedly deficient review of pertinent personnel files").

### 4. Assistance to the Trier of Fact

The third requirement for expert testimony is that it must assist the trier of fact. Frazier, 387 F.3d at 1260. It must "concern[] matters that are beyond the understanding of the average lay person," id. at 1262, and "logically advance[] a material aspect of the proposing party's case." Allison, 184 F.3d at 1312 (quotation omitted).

At the outset, the Court reiterates that it has granted the Sheriff summary judgment on Count III of the Second Amended Complaint: municipal liability. Supra, Section II.B.1. Brown's first, second and fourth opinions relate to James' disciplinary history and the propriety of JSO's supervision and discipline of James. See (Doc. 100-1 at 277–78). While these opinions relate to the § 1983 municipal liability count, they are not relevant to the remaining counts. See Monell, 436 U.S. at 694–95; (Doc. 100 at 12–14). Thus, because these opinions no longer advance Blessing's case, the Court will exclude Brown's first, second, and fourth opinion. See Allison, 184 F.3d at 1312.[13]

---

[13] The Court does not prohibit Brown from discussing otherwise admissible opinions which are incidentally contained in the § 1983 municipal liability-related opinions, such whether James "follow[ed] well-accepted

As to Brown's third opinion, that "James used excessive force to effect a false arrest for which probable cause did not exist," Brown may address this topic with some limitations. (Doc. 100-1 at 278). The Sheriff challenges this opinion as a "pure legal conclusion," arguing that Brown's conclusions as to probable cause, false arrest, and excessive force will "invade the province of the jury." (Doc. 100 at 15–16). The Sheriff is correct that, although expert witnesses may address the predicate facts, they may not give "purely legal conclusions." Washington, 2016 WL 3545909, at *3 (citation omitted).

Here, drawing legal conclusions, such as opining that James used excessive force, lacked probable cause, or committed false arrest, would cross the line. See Bruton v. City of Homestead, No. 20-23960-CIV, 2022 WL 1045556, at *4 (S.D. Fla. Mar. 4, 2022) (holding that an expert witness could not "tell the jury whether Defendants used excessive or unreasonable force"); Washington, 2016 WL 3545909, at *3 (holding that an expert witness could not testify that an officer "lacked probable cause to arrest Plaintiff, thereby making the arrest unlawful, and that [the officer] used excessive force in effectuating the arrest"). This does not mean that Brown cannot discuss Blessing's arrest at all. Brown may use his experience and review of relevant evidence to discuss law

---

standards for law enforcement agencies." (Doc. 100-1 at 277). The Court will entertain more specific motions and objections closer to trial.

enforcement standards and best practices and whether James and Camacho's actions met these standards. See <u>Kobie v. Fifthian</u>, No. 2:12-CV-98-FTM-29DNF, 2014 WL 1652421, at *9 (M.D. Fla. Apr. 23, 2014) (allowing an expert to testify about the "investigative procedures and tactics" used in the case, but not "opine on whether [the officer] had probable cause"). The Court will entertain more specific motions and objections closer to trial.

In conclusion, the Court grants the Sheriff's motion to exclude Brown's first, second, and fourth opinion and grants in part the Sheriff's motion to exclude Brown's third opinion to the extent that Brown may not give purely legal conclusions.

Accordingly, it is hereby

**ORDERED:**

1. Defendants Timothy James and Kathleen Camacho's Motion for Summary Judgment (Doc. 102) is **DENIED**.

2. Defendant Mike Williams' Motion for Summary Judgment (Doc. 101) is **GRANTED as to Count III** and **DENIED as to Counts IV and V** of the Second Amended Complaint (Doc. 42).

3. Defendant ASM Global's Amended Motion for Summary Judgment (Doc. 98) is **GRANTED as to Count VI** of the Second Amended Complaint (Doc. 42). The Clerk will withhold entry of judgment in favor of ASM Global until the conclusion of the case.

4. Defendant Mike Williams' <u>Daubert</u> Motion to Exclude Testimony of Plaintiff's Expert, Dan Brown (Doc. 100) is **GRANTED in part** and **DENIED in part** as stated herein.

5. Now that the Court has ruled on the pending motions, the parties should make a concerted effort to settle the case before the Court sets it for trial. No later than **September 27th, 2022**, the parties shall jointly inform the Court whether they wish to engage in mediation with a private mediator or, alternatively, participate in a settlement conference with United States Magistrate Judge Monte C. Richardson. The Court will administratively close the case while the parties participate in the mediation or the settlement conference. The Clerk is directed to administratively close the case until further order.

**DONE AND ORDERED** in Jacksonville, Florida the 13th day of September, 2022.

*Timothy J. Corrigan*
TIMOTHY J. CORRIGAN
United States District Judge

rmv
Copies:

Honorable Monte C. Richardson
United States Magistrate Judge

Counsel of record